**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Earl Franklin FLUKER et al.,**
**Defendants-Appellants.**

**Nos. 76–1177, 75–3510 and 75–3447.**

United States Court of Appeals,
Ninth Circuit.

Sept. 27, 1976.

Rehearing Denied Oct. 29 and
Nov. 22, 1976.

710

James D. Gilmore, Anchorage, Alaska, for defendant-appellant in No. 75–3447.

Bruce A. Bookman (argued), Anchorage, Alaska, for defendant-appellant in No. 75–3510.

Vincent Vitale (argued), Anchorage, Alaska, for defendant-appellant in No. 76–1177.

John D. Roberts, Asst. U.S. Atty. (argued), Anchorage, Alaska, for plaintiff-appellee.

Before TUTTLE,* HUFSTEDLER and GOODWIN, Circuit Judges.

TUTTLE, Circuit Judge:

John B. Foster, Earl Fluker and Willard Young appeal from convictions stemming from violations of 21 U.S.C. §§ 841(a)(1), 844(a), and 846. Appellants Young and Fluker were found guilty by a jury of possession and of conspiracy to possess with intent to distribute various controlled substances, including heroin. Fluker was also convicted of possession of marijuana, a misdemeanor. Appellant Foster was acquitted of the substantive possession and conspiracy counts, but was convicted of simple possession under § 844(a). A substantial portion of the government's case consisted of evidence acquired during a search of the apartments of appellants Young and Fluker. Prior to trial, the district court denied appellants' motions to suppress the evidence obtained during the searches. On this appeal, appellants raise a number of issues involving, *inter alia*, the correctness of the district court's ruling on the motions to suppress. Specifically, they contend that the affidavit supporting the search warrant for Young's apartment used by the searching and arresting officers was insufficient to establish probable cause, and that the method in which the search warrant was executed violated 18 U.S.C. § 3109, which governs the circumstances under which an officer armed with a warrant may forcibly enter a building without first announcing his authority and purpose. After careful consideration of the record and of all of appellants' arguments, we conclude that, for the reasons articulated below, the district court erred in denying the motion to suppress the evidence obtained as a result

* Honorable Elbert P. Tuttle, Senior Judge, U.S. Fifth Circuit Court of Appeals, sitting by designation.

of the search of Young's apartment and of his person and that consequently the convictions of Young and Foster must be reversed and new trials granted. We find, however, that appellant Fluker's conviction must be affirmed.

Before addressing appellants' arguments, we think it advisable to set forth in some detail the facts underlying their convictions. Where controverted, the evidence is presented in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

On November 1, 1974, a young woman who was a drug user began furnishing confidential information to DEA Special Agent Robert Johnstone concerning alleged narcotics-related activities of appellant Young. Based on information furnished by this informant and by DEA surveillance of Young's apartment, a search warrant was issued on November 4, 1974 (for the text of the supporting affidavit, see Part I *infra*), and was served by Drug Enforcement Administration agents on the premises of Young's apartment that same day.

Young lived in one of two basement apartments at 1127 East 15th Street in Anchorage, and Fluker rented the other. The upper level of the building was occupied by the landlord, although this fact apparently was not known by the DEA agents. At the bottom of an outside stairway to the lower level of the building, a common doorway led into a small entry way or corridor. Immediately off the corridor were the doorways to two apartments. The common doorway opening into the corridor was usually locked (as it was on the day in question) and only the tenants and the landlord had keys. The outside stairway to the lower level apartments led directly down to this entry doorway, which was so situated that someone standing in front of it could move neither to the left nor to the right.

On November 4, 1974, DEA Agents Edward A. Burke and other agents accompanied the confidential informant to the apartment building in question, and the informant entered Young's apartment. Upon leaving the apartment, she returned to Burke and produced a rubber balloon filled with a brown powdery substance which later proved to be heroin. The informant also stated to Burke that she had observed appellants Young and another individual cutting the heroin while she was in the apartment. Burke then proceeded to relay this information by radio to Johnstone, who prepared an affidavit, obtained the search warrant, and radioed back that the warrant had been issued.

The search then commenced. Special Agent O'Brien approached the common doorway at the bottom of the stairs, and while the evidence is unclear whether or not he gave an announcement of authority and purpose before forcing the common door open, the district court found, and we accept the finding for purposes of review, that no announcement was made at this point. After kicking the common doorway in, the DEA agents were at the door to Young's apartment, which the district court found was at least partially open. Again the evidence is somewhat conflicting, but it seems relatively clear that the officers announced themselves and ordered the occupants of the apartment to freeze virtually simultaneously with their entry into the apartment itself.

The agents arrested both Young and Foster; the latter was standing in the living-room-bedroom area, approximately ten feet from the kitchen sink. Following his arrest, Foster was subjected to a search of his person which produced a quantity of narcotics. A search of the apartment produced narcotics paraphernalia and heroin on the kitchen sink and on the kitchen table.

Appellant Fluker was not in Young's apartment when the agents entered; his arrest stemmed from a different set of facts. Two officers had been left outside the building for surveillance purposes. While standing on the lawn near one of the windows, one officer saw a hand reach out the window and put down some substances in two prophylactics and in small packets in plastic baggies. He then summoned his partner, who looked in the window (reaching in and parting the curtains to do so) and

saw several plates, a gun and metal measuring spoons on the kitchen table. The agents told Fluker to freeze and climbed in the window; they saw marijuana in plain view. Fluker was then arrested.

## I. SUFFICIENCY OF THE AFFIDAVIT.

The first issue before us on this appeal concerns the sufficiency of the affidavit prepared by Agent Johnstone to support his application for a search warrant for appellant Young's apartment. We think it important to reproduce the full text of the affidavit at this point, before examining it under the guidelines established by relevant case law:

". . . [T]he facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

'That your affiant is a special agent in charge, Anchorage District Office, Drug Enforcement Administration.

'That on November 1, 1974, he met with a confidential informant who stated that Willard Young, a documented narcotics trafficker in Anchorage, Alaska, told the confidential informant that Young was expecting a shipment of eight ounces of heroin from California to arrive in Anchorage on November 4, 1974. On November 4, 1974, the confidential informant telephoned the affiant and stated that he[1] had been in the residence of Willard Young at 1127 East 15th Street, Apartment # 1, Anchorage, Alaska on November 4, 1974. The confidential informant stated that he had observed Willard Young and Davis Stone, a documented narcotics trafficker in Anchorage, Alaska, in the process of taking a brown powder which Young stated to the confidential informant was heroin and mixing it with a cutting agent. The confidential agent further stated that Willard Young told him that he (Young) was going to cut all the heroin he had received this date, November 4, 1974. The confidential informant also related that Willard

Young told him that he (Young) had received the shipment of heroin for which he had been waiting. The confidential informant further stated that he observed Willard Young place a quantity of a brown powder which Young stated was heroin into a rubber prophylactic and mix a further quantity of the brown powder with a portion of cutting agent. On Nov. 4, 1974, at approximately 6:15 p. m., the confidential informant was observed by Special Agent Edward Burke to exit the above-described residence and proceed to a location where he met with Special Agent Burke and gave Special Agent Burke a rubber balloon filled with a brown powder substance. The confidential informant stated that he had been given the brown powder substance by Young. Special Agent Burke performed a field test on the brown powder substance and observed a positive reaction for opium content.

'The confidential informant is a criminal associate of Willard Young, is addicted to heroin, and receives his heroin for use from Willard Young. The confidential informant stated he has been in Willard Young's residence on prior occasions and had observed Willard Young sell heroin to other known narcotic addicts and traffickers.

'All statements made in the foregoing affidavit are made either on representations made to your affiant by a confidential informer or representations made to your affiant by other law enforcement officers who are named in this affidavit.
/s/ Robert T. Johnstone
 Special Agent in Charge
 Drug Enforcement Administration' "

We begin our analysis of this affidavit mindful of the admonition that a magistrate's determination of probable cause should be paid great deference by reviewing courts. *Jones v. United States,* 362 U.S. 257, 270–71, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

---

1. The affidavit referred to the confidential informant as "he" in order to protect the identity of the informant. Her identity, however, was revealed to the defense prior to trial.

■ All parties are agreed that the legal sufficiency of the affidavit is to be judged under the two-pronged test announced by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and subsequently elaborated on in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1964). The magistrate must be informed of some of the underlying circumstances relied on by the person providing the information, as well as of some of the underlying circumstances from which the affiant concluded that the informant was credible or his information reliable. If the affidavit appears insufficient because either of these criteria has not been met, probable cause may still be established if the affidavit also recites corroborative evidence which buttresses either the informant's reliability or the reliability of his information. *Spinelli, supra*, at 415, 89 S.Ct. 584.

■ Appellants Young and Foster contend that the confidential informant was not reliable since the affidavit did not recite any previous contacts between the police and the informer. This argument carries little weight, however, when one considers that for every informant there must be a first time to inform. We think that the affidavit satisfies both aspects of the *Aguilar-Spinelli* standard. First, it clearly states the "underlying circumstances" from which the informant obtained her information—*i. e.*, personal conversations with appellant Young himself, and prior visits to his apartment during which times the informant allegedly observed narcotics transactions occurring. *See Spinelli, supra*, at 416, 89 S.Ct. 584. As to the informant's credibility or the reliability of her information, the second part of the *Aguilar-Spinelli* test, the affidavit recites sufficient corroborating evidence from which the magistrate could conclude that the information supplied by the informant in the other portions of the affidavit was reliable. The strongest such information is the statement that on November 4, 1974, the confidential informant was observed by Agent Burke entering and later leaving Young's apartment, immediately thereafter producing a balloon filled with a powdery brown substance which proved to be heroin and which the informant stated had been supplied to her by Young. Appellants contend that since the informant was not searched before she entered the apartment, the officers (and the magistrate) thus had no way of knowing that she obtained the heroin from Young, as opposed to already having it on her person at the time she entered the building. This argument overlooks the fact, however, that in affidavit cases such as this only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In addition, the affidavit refers to both appellant Young and his co-defendant Stone as "documented narcotics traffickers," a factor which the Supreme Court has indicated may be entitled to some consideration in assessing the reliability of an informant's tip. *United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

Thus we find that in light of these supporting statements, the affidavit was sufficient under *Aguilar* and *Spinelli*, and that there was probable cause for the issuance of the search warrant of Young's apartment.

## II. THE APPLICABILITY OF 18 U.S.C. § 3109 TO THE OUTER DOORWAY.

Having concluded that the affidavit supporting the issuance of the search warrant for Young's apartment was sufficient, we now turn to the novel question of whether the officers' forcible entry through the common outer doorway violated 18 U.S.C. § 3109, which provides as follows:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

In breaking down the outer doorway opening onto the corridor off of which appellants Young's and Fluker's apartments

were located without an announcement of authority and purpose, Young and Foster argue, the officers violated § 3109, and hence the fruits of the searches of Young's apartment and of Foster's person that followed should have been suppressed. In reviewing the propriety of the district court's ruling on the suppression motion, we follow a two-step analysis: first, we must decide whether, under the circumstances of this case, § 3109's requirement of announcement of authority and purpose was applicable to the outer doorway opening onto the corridor, or whether the section applies only to the door of Young's apartment itself. Second, if we find that § 3109 was indeed applicable to the entry of the outer doorway, we must consider whether exigent circumstances existed that would excuse compliance with the section's provisions for announcement. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

A. *Applicability of § 3109.*

██ The question of § 3109's applicability to an outer doorway of an apartment building is one of first impression for this Court. Several district courts have considered the issue with varying results, and our conclusion here is dictated more by the narrow circumstances of this case than by these prior lower courts' decisions. It is worthwhile, however, to discuss briefly these other cases and the rationales behind their decisions.

In *United States v. St. Clair*, 240 F.Supp. 338 (S.D.N.Y.1963), the district court approved an entry through a vestibule door on the street level which was normally locked and led to a common hallway; the officers had managed to get in and knock on the defendant's apartment door by causing some confusion during a confrontation with the landlord at the vestibule itself. The court specifically found that the hallway was not part of the defendant's apartment and the fact that the door leading to it from the street was locked for security purposes did not make the hallway part of the defendant's dwelling so as to extend his Fourth Amendment rights to that area.

Expressing concern with the possible implications of holding § 3109 applicable to such common doorways, the court noted that in urban centers "the multi-family dwelling is the mode of life." 240 F.Supp. at 340.

Three years later in *Perkins v. United States*, 286 F.Supp. 259 (D.D.C.1968), *aff'd*, 139 U.S.App.D.C. 179, 432 F.2d 612 *(per curiam), cert. denied*, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970), § 3109 was again found inapplicable to the unannounced warrantless entry by searching officers of the front door of a three-story rooming house. The defendant's room was on the second floor of the building, and the officers entered the ground-level front door, which was open, without giving any announcement of authority or purpose, and proceeded to the second floor and to the door of the defendant's room, which was also open, with narcotics in plain view. The district court found that no purpose would have been served by the officers' knocking on the first-floor doorway to the building, in light of the fact that, *inter alia*, the defendant's room was so distant from the doorway to the building that he would have been unable to hear.

In the only reported case called to our attention thus far to apply the requirements of § 3109 to an outer door of an apartment building, a district court in Ohio in 1966 found itself faced with a fact situation quite similar to the one before this Court. *United States v. Blank*, 251 F.Supp. 166 (N.D.Ohio 1966). In *Blank* the searching officers, armed with a search warrant for apartment number 6 in a specific building whose outer door was always locked and could be "buzzed" open only by tenants or the superintendent, smashed a window next to the outer door and reached through it to open a front door. They made no attempt to "buzz" any of the apartments or to summon the superintendent before forcing entry in this way. In holding that this entry violated § 3109, the district court found that *St. Clair* was distinguishable because there, the vestibule door had been left ajar and thus no forcible entry was required to enter the hallway; moreover, the landlord

had been summoned and had refused the agents permission to enter after they had apprised him of their mission. The court refused to place its holding solely on these differences, however, and expressly rejected the *St. Clair* court's fears of unduly hampering law enforcement should § 3109 be found applicable in such situations: "We cannot assume that in every instance the landlord is a look-out for his outlaw tenants." 251 F.Supp. at 174. The court also stressed the common law concept of "curtilage" underpinning the Fourth Amendment and concluded that the concept included, in an apartment building context, hallways and stairways closed from public intrusion.

As noted by this Circuit in *Wattenburg v. United States*, 388 F.2d 853 (9th Cir. 1968), however, the "curtilage" test is no longer appropriate in ascertaining the extent of the Fourth Amendment's protections against unreasonable searches and seizures. Interpreting *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), this Court stated:

> "[I]t seems to us a more appropriate test in determining if a search and seizure adjacent to a house is constitutionally forbidden is whether it constitutes an intrusion upon what the resident seeks to preserve as private even in an area which, although adjacent to his home, is accessible to the public. . . ."

*Wattenburg, supra*, at 857 (citations omitted). Thus the critical question before this Court is whether, under the particular circumstances of this case, appellant Young can be said to have had a "reasonable expectation of privacy" with respect to the corridor area separating the door of his apartment from the outer doorway of the apartment building. After careful consideration of the record, we conclude that such was the case, and that consequently § 3109 was applicable to the outer doorway.

We begin with the fact that this building was not one containing many individual apartment units, but rather was comprised of only two apartments on the basement level and the landlord's living quarters on the upper floor. Thus, the entry way was one to which access was clearly limited as a matter of right to the occupants of the two basement apartments, and it is undisputed that the outer doorway was always locked and that only the occupants of the two apartments and the landlord had keys thereto. In light of the size of the building, then, we find significant the fact that the door to the hallway giving access to the two apartments was locked; the two lower-level tenants thus exercised considerably more control over access to that portion of the building than would be true in a multi-unit complex, and hence could reasonably be said to have a greater reasonable expectation of privacy than would be true of occupants of large apartment buildings. *See Perkins v. United States*, 139 U.S.App.D.C. 179, 432 F.2d 612 (1970) (Bazelon, J., dissenting).[2]

Another significant fact is that directly beyond the outer doorway, actually within reach, lay the door to appellant Young's apartment. Thus, a knock on the outer door might well have been audible in Young's apartment, and would not have been a useless gesture. *Cf. United States v. Perkins*, 286 F.Supp. 259 (D.D.C.1968). It is also worth noting that the district court found that the door to Young's apartment was at least partially open when the officers broke down the outer door and gained access to the corridor, thus indicating that Young felt some degree of safety and privacy because of the existence of the outer, locked doorway.

This Court has previously discussed the origins and purposes of § 3109, *see United States v. Bustamante-Gamez*, 488 F.2d 4, 9–10 (9th Cir. 1973), finding that, *inter alia*, the statute "symbolizes [a] respect for individual privacy." *Id.* at 9. Measured by the standard announced in *Katz*, we find that under the narrow set of facts in this case, appellant Young had a reasonable expectation of privacy as to the hallway separating

---

2. The Sixth Circuit recently held that a tenant in an apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public. *United States v. Carriger*, 541 F.2d 545 (1976).

his apartment door from the outer, locked door which was forced open by the officers in violation of § 3109. In finding § 3109 applicable here, we note that we are *not* intimating that a similar result would obtain in circumstances other than the one before us; our holding is confined to the facts of this case. We now turn to a consideration of the question whether "exigent circumstances" excused the officers' failure to comply with the announcement requirements of § 3109.

B. *Existence of Exigent Circumstances.*

In *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the Supreme Court recognized that in certain circumstances, non-compliance with § 3109's provisions might be excusable. The three exceptions, identified in the dissenting opinion of Mr. Justice Brennan, were stated as follows:

"(1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), and then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted."

374 U.S. at 47, 83 S.Ct. [1623] at 1636. These exceptions were subsequently recognized by the Court in *Sabbath v. United States,* 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). In the *Sabbath* opinion, the Court in n. 8 stated:

"Exceptions to any possible constitutional rule relating to announcement and entry have been recognized, *see Ker v. California, supra,* at 47 [83 S.Ct. 1623 at 1636] (opinion of Brennan, J.) . . . ."

391 U.S. 585, 591, n. 8, 88 S.Ct. 1755, 1759, 20 L.Ed.2d 828.

The government contends that the third exception is applicable here. We do not agree. No evidence has been called to our attention which would support a suspicion

that the narcotics allegedly in the apartment were in the process of being destroyed; on the contrary, the informant's report was that the inhabitants were in the process of cutting the heroin and preparing it for distribution, and there was no indication that they were expecting the arrival of drug enforcement agents. Nor did any of the searching officers testify that they heard any sounds of running feet or other suspicious activity from within Young's apartment, beyond the door. *Cf. United States v. Manning, on rehearing en banc,* 448 F.2d 992 (2d Cir. 1971), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971).

The government also contends that under Ninth Circuit law compliance with § 3109 is excused when that compliance might alert a suspect and increase the officer's peril. *See Gilbert v. United States,* 366 F.2d 923 (9th Cir. 1966), *cert. denied,* 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967). In *Gilbert,* however, the suspect sought by the police during their search was believed to have shot and killed a police officer during a bank robbery that same morning. Here, by contrast, the evidence revealed at trial that one of the persons suspected by the DEA agents to be in Young's apartment on the day of the search owned a gun is simply not sufficient; it is clear that Stone had a permit for the weapon and there was no evidence that he had ever been convicted of illegal possession of firearms or of use of firearms in the commission of a crime. The mere fact that he possessed a gun cannot be said to have reasonably supported a belief that he was armed at the time of the search or that he constituted a threat to the officers' safety.

We thus conclude that no "exigent circumstances" existed at the time of the search which excused compliance with the requirements of § 3109 with respect to the outer doorway to the basement level apartments. Hence, the searches of appellant Young's apartment, and of appellant Foster's person, which followed the officers' entry, violated § 3109 and the district court erred in denying appellants' motion to suppress the fruits of those two searches. In

light of our disposition of this issue, we find it unnecessary to deal with the remaining contentions of appellant Young and Foster, and turn our attention to those issues raised by appellant Fluker, whose apartment was also searched and narcotics discovered.

## III. VALIDITY OF THE SEARCH OF FLUKER'S APARTMENT.

 Fluker makes a number of arguments in seeking to have this Court find that the search of his apartment violated his Fourth Amendment rights, and that his arrest was illegal. His first argument, that probable cause for his arrest was gained only during the execution of an invalid search warrant, requires no discussion since it is clearly without merit in light of our disposition of the search warrant issue (see Part I *supra*).

The facts surrounding appellant Fluker's arrest and the search of his apartment have already been detailed. Fluker's second contention is that the officers were in a place where they had no right to be when they saw him place the heroin outside the window. From the record it appears that one of the officers was within three feet of Fluker's window at the corner of the building; he called the other over when he saw a hand placing the baggies and prophylactics, which proved to contain heroin, outside on the ground. In effect, Fluker asserts that the officers violated his right to privacy since they were only a small distance from his window and may not have been on public property.

The district court found, and we agree with its finding, that the officers were where they had a right to be when they spotted Fluker's hand reach outside the window and drop the contraband on the ground. They were on the premises to effectuate a valid search warrant on one of the apartments in the building, and had been assigned to keep watch, presumably to prevent the escape of anyone who might attempt to leave the building under suspicious circumstances. There is no evidence

in the record which would indicate that the yard was in any way fenced off or removed from the street so as to support an argument that it was closed to the public. *Compare Fixel v. Wainwright*, 492 F.2d 480 (5th Cir. 1974), where the Fifth Circuit found an intrusion into a backyard of a multi-unit building a violation of the Fourth Amendment where the yard was "completely removed from the street and surrounded by a chain link fence," *id.* at 484. Thus, we find no violation of Fluker's Fourth Amendment rights by the officers' actions in being stationed close to the building right outside the window at the time of the search.

Having seen the objects deposited outside the window, the officers parted the window curtains and looked inside; they saw Fluker and, on his kitchen table, plates, measuring spoons, and a gun. They ordered him to freeze and entered through the window. This entry, Fluker asserts, violated Alaska Statute 12.25.100:

> "A peace officer may break into a building or vessel in which the person to be arrested is or is believed to be, if the officer is refused admittance after he had announced his authority and purpose." [3]

Since Fluker's arrest was made by an Alaska State Trooper, Officer Hagan, who was working with federal officials, we will assume for the purpose of our discussion here that Alaska law was applicable, since the entry was made to effect an arrest. *See United States v. Bradley*, 455 F.2d 1181 (1st Cir. 1972), *aff'd*, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973). Even so, the Alaska Supreme Court in interpreting the statute at issue has referred to federal case law specifically those decisions dealing with 18 U.S.C. § 3109. *See Davis v. State*, 525 P.2d 541 (Alaska 1974).

Fluker contends that Officer Hagan's entry was a "breaking" within the meaning of the state statute, since he pushed aside the curtain while kneeling outside the window. Assuming *arguendo* that such a characterization is correct, we find that any noncom-

---

**3.** Fluker admits that if the officer who saw the contraband placed outside the window was legally in the place where he observed this occur, there was authority to arrest Fluker.

pliance with the provisions of the Alaska statute at issue was excusable because of the existence of "exigent circumstances." *Ker v. California, supra,* at 47, 83 S.Ct. 1623. Clearly, when the officers observed a hand placing objects outside the window on the ground, they were justified in fearing that evidence was being disposed of or an attempt to escape was perhaps in the offing, either of which beliefs would bring their actions within the ambit of the third exception in *Ker.*

In conclusion, we hold that the convictions of appellants FOSTER and YOUNG must be reversed for the reasons stated above, and new trials granted them. The conviction of appellant FLUKER is affirmed.

The judgment of the district court is AFFIRMED IN PART, and REVERSED AND REMANDED IN PART for further proceedings not inconsistent with this opinion.